UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,                     Case No. 23-10149
                        Plaintiff,
v.                                     Susan K. DeClercq
                                       United States District Judge
INSURANCE SUPERMARKET
INC. and EMC NATIONAL LIFE             Curtis Ivy, Jr.
COMPANY,                               United States Magistrate Judge
                        Defendants.
_____/

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 74)**

Plaintiff Mark Dobronski sued Defendants Insurance Supermarket, Inc., and

EMC National Life Co., (together "ISI") for violations of the Telephone Consumer

Protection Act ("TCPA") and the Michigan Telephone Companies as Common

Carriers Act. (ECF No. 1). He alleges that he received illegal telemarketing calls

32 times from ISI or an ISI agent. Before the Court is ISI's motion for summary

judgment on all claims. (ECF No. 74). It is fully briefed and ready for report and

recommendation.

For the reasons below, the undersigned **RECOMMENDS** that the motion

for summary judgment be **GRANTED IN PART, DENIED IN PART**.

I.      **STATEMENT OF DISPUTED AND UNDISPUTED FACTS**

Three of Plaintiff's telephone numbers were variably involved in the challenged calls: residential number ending in 1000, residential number ending in 0222, and cellular telephone number ending in 9671.  (ECF No. 74-3, PageID.1182, Plaintiff's Deposition).  All three numbers are on the national Do Not Call registry.

By way of background, ISI purchases leads from "publishers" who reach out to consumers by telephone and identify those who qualify for ISI's insurance services.  (ECF No. 74-7, PageID.1248, Rua Declaration).  Once a consumer is identified as a potential qualifying lead, the publisher transfers the consumer to an ISI representative.  (ECF No. 75, PageID.1417, Sidney Rua Deposition).

The first contested call went to Plaintiff's 9671 number on May 10, 2022.  (ECF No. 74-3, PageID.1186).  After Plaintiff answered the call, there was about a five-second delay before there was a "boink" sound and a person came on the line identifying themself as Mario from "Senior Benefits."  (*Id.* at PageID.1187).  Mario asked Plaintiff a series of questions.  Mario then tried to "live" transfer Plaintiff to a licensed agent to further discuss an insurance plan.  During those attempts, Plaintiff could hear a recorded message stating that the person at telephone number (218) 618-0490 was unavailable.  Mario could not connect Plaintiff so he said he would call back and try again later.  (*Id.* at PageID.1187-88).

In the meantime, Plaintiff called the telephone number shown on his caller ID when he spoke with Mario, but a recorded message said the number was not in service. (*Id.* at PageID.1188). Thus, Plaintiff believes that it was a spoofed caller ID. Then, using his 1000 residential line, Plaintiff called the 0490 telephone number he heard repeated when Mario tried to transfer him. A person from Defendant Insurance Supermarket answered the call, asked Plaintiff prequalifying questions, and transferred him to a licensed agent, Cornelius Rhodes. (*Id.* at PageID.1189). Plaintiff deployed his "canary trap" with Rhodes. He gave Rhodes fictitious personal identifying information, identifying himself as Thomas Clarke, and providing a false social security number and date of birth. (*Id.* at PageID.1189, 1190). They "talked a little bit about" Plaintiff buying a $20,000 life insurance plan with Defendant EMC National Life Company. (*Id.* at PageID.1189). Plaintiff provided a controlled bank account or credit card number to "purchase" the policy. Plaintiff uses this tactic because the bank declines the transaction but retains the information of the entity that attempted the transaction. (*Id.* at PageID.1195-96). That way he learns the legal identity of the entity who tele-marketed a product or service to him.

During their conversation, Plaintiff told Rhodes he wanted to talk to someone at ISI about getting on a do-not-call list. Rhodes said he would send a message to his boss about Plaintiff's request. Later, Rhodes called back to

Plaintiff's 1000 number to say that his boss placed Plaintiff on ISI's Do Not Call list (this telephone call is not one of the 32 calls at issue).  (*Id.* at PageID.1189).

Sidney Rua, ISI's vice president of compliance, insists that ISI does not have an agent-principal relationship with any publisher, and that ISI expects that when it receives a lead from a publisher, the lead was generated in compliance with applicable laws.  (ECF No. 74-7, PageID.1248).

Calls 2-31 all came from the same number with the caller ID name "Insurance Supermarket" to Plaintiff's 1000 number.  (*Id.* at PageID.1193). Plaintiff listed these calls in his complaint with a notation of whether the caller hung up, the caller left a voicemail, or Plaintiff conversed with the caller.  (ECF No. 1, PageID.22-23).  According to this list, calls 2-5, 7-12, 16-17, 19, 21-23, 25-29, and 31 were hung up after Plaintiff answered.  Voicemail was left on calls 6, 13-15, 18, 20, and 24.  Plaintiff spoke with a person on call 30.  Plaintiff confirmed this information at this deposition.  (ECF No. 74-3, PageID.1203-04).

ISI says Calls 2-30 were from the retention department, but it insists it has no record of Call 4.  (ECF No. 74-3, PageID.1201).  At Plaintiff's deposition, ISI's counsel said that ISI's Do Not Call policy allows the company to continue to contact a person on the Do Not Call list for service-related issues, including billing. (ECF No. 74-3, PageID.1197).

Mr. Rua identified one phone call to Plaintiff's 1000 number as a transfer from the publisher; he identified 29 other calls from the "retention department." (ECF No. 75, PageID.1418).  Plaintiff asked Rua what purpose the retention department would have for calling his 1000 number.  Rua explained, "The reason the retention department would call out is in the event of an issue with a policy that a client expressed interest in obtaining and provided information for payments.  So, the retention department's responsibility is to ensure that if there's an issue with an application and for the benefit of the client, to ensure that they are getting the policy requested."  (*Id.*).  Plaintiff then asked whether the purpose of a telephone call from the retention department would be to encourage a purchase of ISI services.  Rua said, "it's one of the reasons."  (*Id.* at PageID.1419).

Of the telephone calls that included a voicemail message, the caller indicated that they wanted to discuss the life insurance policy "you have through us with EMC."  (ECF No. 74-10, PageID.1263).

The final call, Call 32, occurred on August 18, 2022, to Plaintiff's 0222 line.  The caller ID displayed "Lakisha Bolden."  When Plaintiff answered, he heard a "boink" sound followed by a seven-second delay.  Then, a person named Dominic joined the line and introduced himself as calling from Senior Benefits.  Plaintiff contends that Dominic was pre-recorded, asking questions and responding as if Plaintiff answered though he did not.  (*See* ECF No. 1, PageID.24; ECF No. 74-3,

PageID.1223).  When the recording was complete, Plaintiff was transferred to

David Brown at Senior Benefits, then transferred again to Doris, who in turn

transferred Plaintiff to a person at ISI.  (ECF No. 74-3, PageID.1223).

Plaintiff's recollection of the discussion he had with the last person he was

transferred to differs from the recording of the call.  At his deposition, Plaintiff

testified that the person he spoke with said she knew that calling consumers with

pre-recorded calls was offensive to consumers and that ISI was violating the law

by using those recorded calls.  (ECF No. 74-3, PageID.1224).  Plaintiff recounted

the same in his declaration.[1]  (ECF No. 75, PageID.1409, ¶ 14).

The woman he spoke with was Alicia Ervin.  The discussion between

Plaintiff and Ervin did not go quite as Plaintiff recalls in his declaration.  Ervin

agreed with Plaintiff that people get offended by recorded messages in

telemarketing calls.  Plaintiff asked her why ISI was calling him despite his being

on the national Do Not Call list.  Ervin said she did not know but would bring it up

with the "higher-ups."  (ECF No. 78-3, PageID.1469, Transcript of Call with

Ervin).  Ervin confirmed that she was trained to place consumers on the Do Not

Call list if requested.  Plaintiff then told Ervin, "they're breaking the law, is what

they're doing."  Ervin said, "I hope not."  (*Id.*).

---

[1] It is concerning that Plaintiff

Plaintiff accuses ISI of not having an internal, written Do Not Call policy. He asked for a copy of the policy on the call with Rhodes and during Call 30, but did not get a copy until the parties exchanged discovery here.  (ECF No. 74-2, PageID.1191).

## II.    ANALYSIS AND RECOMMENDATIONS

### A.    <u>Governing Standards</u>

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth

specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

That Plaintiff is *pro se* does not reduce the obligations under Rule 56. Rather, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  "Once a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz [v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of*

*Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)

(quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.

2004)).

     B.   <u>Discussion</u>

Plaintiff sues ISI for violating the TCPA by (1) using an automated

telephone dialing system (47 C.F.R. § 64.1200(a)(1)(iii) and (a)(2)), (2) not

connecting him to a live sales representative within two seconds of the called

person's completed greeting (47 C.F.R. § 64.1200(a)(7)), (3) failing to identify the

business on whose behalf the call was placed (47 C.F.R. § 64.1200(a)(7)(A)), (4)

failing to provide an opt-out mechanism during the call (47 C.F.R. §

64.1200(a)(7)(B)), (5) permitting their agent to call a number on the national Do

Not Call registry (47 C.F.R. § 64.1200(c)(2)), (6) failing to honor Plaintiff's do-

not-call request (47 C.F.R. § 64.1200(d)(3)), (7) failing to have a written do-not-

call policy available on demand (47 C.F.R. § 64.1200(d)(1)), and (8) failing to

have caller identification display a telephone number to permit the individual to

make a do-not-call request (47 C.F.R. § 64.1200(e)(1)).  The last claim is for

violation of Michigan's telecommunications statute.

Defendants seek summary judgment on all of Plaintiff's claims.  They begin

by arguing that they have no agency relationship with the telemarketers at Senior

Benefits, so they cannot be liable for any TCPA violations for Calls 1 and 32.  For

the rest of the calls, and alternatively for Calls 1 and 32, they attempt to show how each of Plaintiff's claims fail on the merits and for lack of issue of material fact. (ECF No. 74).

       1.    Agency Relationship

Calls 1 and 32 were the telemarketing calls from "Senior Benefits" to gather pre-qualifying information from Plaintiff.  ISI argues that any TCPA violations from those calls cannot be imputed to them because they had no agency relationship with the telemarketer and no one at ISI initiated those calls. According to Plaintiff, Senior Benefits had "apparent authority" to initiate telemarketing calls on ISI's behalf because ISI accepted the transfers for Calls 1 and 32 without hesitation, or at least ISI ratified the calls.  (ECF No. 75, PageID.1384).

The Sixth Circuit recognizes that liability for violations of the TCPA can be based on vicarious liability.  *Imhoff Investment, LLC v. Alfoccino, Inc.*, 792 F.3d 627, 635 (6th Cir. 2015).  Courts determine vicarious liability using federal common law agency principles.  *Id.*; *see also Dobronski v. Tobias & Assoc., Inc.*, 769 F. Supp. 3d 681, 698 (E.D. Mich. 2025).

Agency is the relationship created when a principal manifests assent to an agent "that the agent shall act on the principal's behalf and subject to the principal's control."  Restatement (Third) Of Agency § 1.01 (2006).  A "formal"

agency relationship is not required to find vicarious liability.  *See Lucas v. Telemarketer Calling From (407) 476-5680*, 2019 WL 1354379, at *4 (6th Cir. Nov. 1, 2019).  Instead, we look to the totality of the circumstances, including whether ISI "delegated actual or apparent authority to place those calls, or if Defendants ratified the act through acceptance of benefits."  *Dobronski*, 769 F. Supp. 3d at 698; *Lucas*, 2019 WL 1354379, at *4.

Actual authority exists when the principal assents to the agent taking action on the principal's behalf.  Restatement (Third) Of Agency § 3.01 (2006).  There is no dispute here—ISI did not give actual authority to Senior Benefits to act on its behalf.

The Restatement (Third) of Agency § 2.03 defines "apparent authority" as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373-74 (6th Cir. 2015) ("under the theory of apparent authority, a principal will incur liability for the acts of an 'agent' if the principal held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority.").  "The apparent power of an agent is to be determined by the act of the *principal* and not by the acts of the *agent*[.]"

11

*Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (emphasis added). "Statements by an agent are insufficient to create apparent authority." *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 215-16 (S.D.N.Y. 2024) (quoting *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020)) (Critical to a finding of apparent authority is that the "written or spoken words or . . . conduct of the principal create the impression that the agent is acting on behalf of the principal.").

What needs to be communicated to the third party is that the agent had authority to act for the principal, not merely to act pursuant to contractual obligations it may owe to the principal. *Keating*, 615 F. App'x at 372 (citing Restatement (Third) of Agency § 1.01 (2006)). So here, Plaintiff needs to show that Senior Benefits called him *for* ISI, not independently hoping to make a sale to one of the many companies it is paid to find leads for. Indeed, "[i]t is in the nature of a third-party telemarketer that it will transfer the leads it receives to a party who can use them. That does not mean that the telemarketer is acting on the authority of another, rather than on its own authority in the hope of making a sale." *Cacho*, 739 F. Supp. 3d at 216.

In the telemarketing context, the relationship between the telemarketing third party and the defendant can be murky. The Federal Communications Commission ("FCC") issued an order in part addressing how apparent authority

could be established in the TCPA context that helps hone our determination of exactly what their relationship was from the plaintiff's perspective.  In *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6592 (2013), the FCC provided these examples of evidence of apparent authority: (1) the company "allow[ed] the outside sales entity access to information and systems that normally would be within [its] exclusive control," such as "detailed information regarding the nature and pricing of [its] products and services" or "customer information"; (2) the telemarketer could "enter consumer information into [the company's] sales or customer systems"; (3) the telemarketer had "the authority to use [the company's] trade name, trademark and service mark"; and (4) it "approved, wrote or reviewed the outside entity's telemarketing scripts."  *Id.*

In the view of the undersigned, the evidence does not exist to support a finding of apparent authority on Call 1 because of the absence of conduct or statements by ISI that could create the impression that Senior Benefits called Plaintiff for ISI or on its behalf.

To begin, none of the examples in the FCC order are supported by evidence in this record.  (*See* ECF No. 74-7); *see Krakauer v. Dish Network*, L.L.C., 925 F.3d 643, 662 (4th Cir. 2019) (finding vicarious liability where one defendant authorized another to use its name and logo in carrying out its operation, took no meaningful action to ensure TCPA compliance, and profited from the other

defendant's actions); *Hossfeld v. Gov't Emps. Ins. Co.*, 88 F. Supp. 3d 504, 510 (D. Md. 2015) (finding defendant company liable for the actions of third-party telemarketers where it contracted with them, created scripts for them, knew they were using ATDS, and had them make calls with ATDS before forwarding the calls to its representatives).

The evidence that does exist relevant to this question does not establish apparent authority.[2]  During Call 1, the caller attempted a live transfer to an insurance company, but the transfer did not go through.  Plaintiff overheard the telephone number he would have been transferred to, so he called that telephone number on his own.  That is when he learned that the live transfer was an attempt to connect Plaintiff to Defendant Insurance Supermarket.  It does not appear from the record that the Senior Benefits representative told Plaintiff he was being transferred to ISI or mentioned anything about ISI specifically.

---

[2] Plaintiff included allegations in the complaint to show the relationship between ISI and the telemarketer.  According to the complaint, Plaintiff alleges that ISI "hires and authorizes" telemarketers to make "illegal robocalls" to solicit Defendant EMC's insurance products.  (ECF No. 1, PageID.18, ¶ 52).  He says ISI approves contracts with the telemarketers and pays them. (*Id.* at ¶¶ 53-54).  For Call 1, specifically, Plaintiff alleged that the Senior Benefits representative could not live transfer him to a telephone number with area code 218, so the representative said he could call Plaintiff back.  Plaintiff later directly called the 218 number and spoke to two persons with Defendant Insurance Supermarket. (*Id.* at PageID.20-21).  Plaintiff asked the last person he talked to, Rhodes, about who initially called him from Senior Benefits.  According to Plaintiff, "Rhodes stated that Defendant ISI hires a third-party to initiate telephone calls and transfer the calls to him." (*Id.* at PageID.21, ¶ 72).

The complaint is unverified which means it is not evidence that can be used to defeat a motion for summary judgment.  Only verified complaints have "the same force and effect as an affidavit for purposes of responding to a motion for summary judgment." *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (citation omitted).

14

Whether there was apparent authority focuses on ISI's words or actions to third parties.  During Plaintiff's deposition, there was mention of the conversation with Rhodes related to Call 1.  Plaintiff testified that he told Rhodes he "wanted to know who had called [him] earlier."  (ECF No. 74-3, PageID.1189).  Rhodes' response is not included with the excerpted transcript, if there was a response.  Plaintiff's inquiry alone does not establish (or create a question of material fact) that ISI held Senior Benefits out to third parties as having authority to act on ISI's behalf.

There are statements in the record from Mr. Rua, the vice president of compliance at ISI, concerning the relationship with "publishers."  He said that ISI purchases leads from "publishers" (like Senior Benefits), but that ISI does not directly or indirectly instruct the publisher's actions, at least in part because the publishers represent other companies as well as ISI.[3]  (ECF No. 74-7, PageID.1248, ¶ 12-13; ECF No. 75, PageID.1417).  Rua's statements do not suggest that ISI held out to third parties that Senior Benefits had authority to act on its behalf when it initiated Call 1.

It is also relevant that the transfer from Senior Benefits to ISI did not work.  Plaintiff talked to an ISI representative only because he called ISI himself.  Senior

---

[3] It appears that Mr. Rua had more to say about ISI's relationship with its publishers during his deposition, but Plaintiff did not provide more of the transcript for the Court to assess that testimony.

15

Benefits' inability to make the transfer to ISI detracts from a sense that ISI gave

Senior Benefits authority to act on ISI's behalf, rather than pursuant to a possible

contractual obligation or at least hoping to make a sale.

Lastly for Call 1, Plaintiff contends that ISI ratified Senior Benefits' actions

by accepting the transferred call without hesitation.  ISI did not accept the transfer

from Call 1, so Plaintiff's argument is misplaced.

The undersigned finds a question of material fact on vicarious liability for

Call 32.  This time, Plaintiff was live transferred to ISI.  The last person with

whom Plaintiff spoke at ISI was Alicia Ervin who told Plaintiff that ISI hired

Senior Benefits to ensure the person is interested in life insurance before

transferring them to an ISI representative.[4]  (ECF No. 78-3, PageID.1469, call

transcript).

Neither case law nor the Restatement (Third) of Agency hold that successful

transfer of a telephone call to the defendant alone establishes apparent authority of

the telemarketer.

_____

[4] The parties present differing versions of the conversation between Plaintiff and Ervin.
In his declaration, Plaintiff asserts that Ervin told him that she knew ISI initiated calls to
consumers with recorded messages and that she knew ISI was violating the law by doing so.
(ECF No. 75, PageID.1409).  The undersigned does not accept the version of the conversation
presented in Plaintiff's declaration because it is plainly contradicted by objective evidence—the
recording of the conversation.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing
parties tell two different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the facts for the
purposes of ruling on a motion for summary judgment.").  The undersigned accepts the transcript
and recording as the true version of that telephone conversation.

As with Call 1, it does not appear that the Senior Benefits representative referenced ISI by name before transferring the telephone call or made a statement that they were authorized to market ISI's insurance plans. Nor does the evidence satisfy any of the examples of apparent authority listed in the FCC order.

What creates an issue of material fact is that Ervin told Plaintiff that ISI hired the "qualifier" to make sure the called person was interested in insurance before transferring to ISI. A reasonable jury could conclude that Ervin's statement would give the impression to a third party that Senior Benefits was acting on ISI's authority when it called Plaintiff. So while merely hiring a company to transfer leads or paying a company that transfers leads does not establish an agency relationship, Senior Benefits' call and Ervin's statement gives the impression that Senior Benefits initiated Call 32 for ISI on ISI's authority.

Plaintiff contends that ISI at least ratified Senior Benefits' actions, if not authorizing it. It appears that there is a question of material fact here too.

"[R]atification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions." *Lucas*, 2019 WL 3021233, at *5 (citation omitted). If an act is ratified, the consequence is that the principal's legal relations "are affected as they would have been had the actor been an agent acting with actual authority at the time of the act." Restatement (Third) Of Agency § 4.01 (2006). Here too, mere acceptance of a call from a telemarketer does not equate to

knowing acceptance of a wrongfully obtained call.  An entity "who has ratified is not bound by the ratification if it was made without knowledge of material facts about the act of the agent or other actor."  Restatement (Third) Of Agency § 4.06 (2006).  "Ratification may . . . occur by conduct, rather than speech, but typically only if the relevant conduct cannot 'be otherwise explained.'"  *Black v. SunPath Ltd.*, 2022 WL 4241270, at *5 (M.D. Tenn. Sept. 14, 2022) (quoting *Osborn v. Griffin*, 865 F.3d 417, 445 (6th Cir. 2017)).  Or "a person may ratify an act by manifesting assent that the act affect the person's legal relations."  Restatement (Third) Of Agency § 4.01 cmt. d.

The fact material here is that Call 32 was initiated using a prerecorded voice potentially in violation of the TCPA (see discussion on Count I, below, regarding the issue of material fact about the prerecorded aspect of the call).  Plaintiff told Ervin that the call from Senior Benefits was prerecorded and that the call was illegal.  Ervin agreed that prerecorded calls can be offensive to people and that she hoped the call was not illegal.  (ECF No. 78-3, PageID.1469-70).

Ervin was made aware of the material fact.  It is arguable whether she repudiated that act.  Black's Law Dictionary (12th ed. 2024) defines "repudiate" as an act to "reject or renounce" or "to assert or demonstrate the incorrectness of (an idea, doctrine, stereotype, etc.)."  A reasonable jury could view Ervin's statements about the prerecorded call as something less than repudiation of Senior Benefits'

actions.  Having heard from Plaintiff that he was called with a precorded message

and told that it was illegal, Ervin's decision not to end the call then or make a

stronger statement against what Senior Benefits did indicates some level of consent

to be bound by Senior Benefits' conduct.  Or at least a reasonable jury could think

so.  *See Davis v. Mut. Life Ins. Co. of N.Y.*, 6 F.3d 367, 375 (6th Cir. 1993) (insurer

ratified agent's fraudulent sales methods because it was aware of those methods).

In short, the undersigned suggests that ISI not be held vicariously liable for

conduct on Call 1 but that there are questions of material fact on its vicarious

liability for Call 32.

2.     Count I – ATDS

Plaintiff alleges that ISI illegally used automated telephone dialing systems

("ATDS") or a prerecorded voice without his consent on all the telephone calls.

The TCPA prohibits entities from initiating a telephone call using an ATDS or an

artificial or prerecorded voice.  47 C.F.R. § 64.1200(a)(1)(iii) and (a)(2).

ISI argues for judgment on this claim because of the absence of evidence

concerning ISI's communication system.  (ECF No. 74, PageID.1157-58).  In

support of the argument, ISI presents Mr. Rua's declaration.  Rua says that ISI

does not use ATDS "in the ordinary course of business, does not use an ATDS to

place marketing or sales calls, and does not authorize another entity to use such a

system on its behalf."  (ECF No. 74-7, PageID.1249, ¶ 22).

Though Count I alleges this violation occurred on all 32 calls, Plaintiff's argument and testimony about a prerecorded voice is limited to Call 32. During his deposition, Plaintiff confirmed that what is stated in paragraph 82 in his complaint accurately describes what occurred when he picked up Call 32. (ECF No. 74-3, PageID.1223). Paragraph 82 describes a prerecorded voice on Call 32 asking questions with delays after each question followed by a response as if Plaintiff answered the questions, but he did not answer the questions. Those delays and responses led Plaintiff to believe that the voice was prerecorded. (ECF No. 1, PageID.24). Paragraph 82 and Plaintiff's confirmation of its accuracy are the only evidence in support of Plaintiff's position on Count I. Plaintiff did not seek any evidence during discovery about ISI's or Senior Benefits' communication systems.

Without any evidence about Calls 1-31 concerning ATDS or prerecorded messages, judgment should go to ISI for these calls. The remaining question is whether ISI used or apparently authorized Senior Benefits to use ATDS or a prerecorded message on Call 32.

ISI insists it cannot be liable for Senior Benefits' use of ATDS or prerecorded messages on Call 32 absent an agency relationship. (ECF No. 74, PageID.1158). Since the undersigned finds a question of material fact on the issue of vicarious liability for Call 32, ISI's argument does not defeat Count I. ISI bears the burden of establishing its entitlement to judgment as a matter of law. ISI did

not argue that Senior Benefits did not use a prerecorded or artificial voice on Call

32.  Rua's statements in his declaration that ISI does not employ ATDS does not

address Senior Benefits' communications system or possible use of artificial or

prerecorded messages.  If the jury finds ISI vicariously liable for Senior Benefits

on Call 32, then the jury will examine both Plaintiff's description of Call 32 and

Rua's testimony about ISI.[5]  A reasonable jury could find in Plaintiff's favor, so

judgment should not be entered for ISI on Count I.

### 3.  Counts II, III, and IV

Plaintiff alleges that Calls 2-5, 7-12, 16-17, 19, 21-23, 25-29, and 31-32 (23

calls) violated § 64.1200(a)(7) and its subsections in Counts II, III, and IV because

of call abandonment, failure to identify the caller, and failure to provide an opt-out

message, respectively.  (ECF No. 1, PageID.26-27).

Section (a)(7) prohibits an entity from abandoning more than 3% of

telemarketing calls that are answered live over a 30-day period (the basis of the

claims in Count II).  "A call is 'abandoned' if it is not connected to a live sales

---

[5] Plaintiff argued that Rua's declaration is improper because Rua did not take on the role of vice president of compliance until July 2022, so he does not have personal knowledge of ISI's communication practices before then.  This argument is unavailing for two reasons.  First, Plaintiff's argument appears to misunderstand "personal knowledge" in this context.  Affidavits or declarations used in support of a motion for summary judgment must be based on personal knowledge.  Fed. R. Civ. P. 55(c)(4).  Rua, in his role as vice president of compliance, is familiar with ISI's policies and procedures including those in place before his employment by reviewing those earlier policies.  Second, the call in question here occurred in August 2022, after Rua became the vice president.  There can be no credible argument that Rua had no personal knowledge of ISI's policies while he was vice president of compliance.

representative within two (2) seconds of the called person's completed greeting."
*Id.*

If a live sales representative is unavailable when the person answers, subsection (a)(7)(i)(A) requires the entity to provide a prerecorded identification identifying the name of the business, the entity initiating the call, and the telephone number of the entity that permits the called person to opt-out (Count III). Subsection (a)(7)(i)(B) requires an automated, interactive voice or key press-activated opt-out mechanism that allows the called person to make a do-not-call request before terminating the call (Count IV).

The relationship between (a)(7) and its subsections (i)(A)-(B) is unclear. *See Dobronski v. Selectquote Ins. Servs.*, 2025 WL 904370, at *8 (E.D. Mich. Jan. 14, 2025). The introductory section, (a)(7), makes it a TCPA violation to abandon more than 3% of telemarketing calls over a 30-day period for a single calling campaign. Then, the subsections appear to describe a different violation separate from an abandonment rate. This part of the regulation says that "*[w]henever* [the call is 'abandoned'] . . . the telemarketer or the seller must provide" opt-out mechanisms. § 64.1200(a)(7)(i)(A)-(B) (emphasis added). Having written that telemarketers must provide opt-out options "whenever" a live sales representative is unavailable, the regulation applies to all abandoned calls regardless of abandonment rate. "And then, [of course,] even if the caller has an opt-out

22

mechanism, it cannot rely on it too much—that is, it cannot "[a]bandon more than three percent of all telemarketing calls" in a single campaign" or else it violates (a)(7). *Selecquote Ins. Servs.*, 2025 WL 904370, at *9. So the regulation appears to do a few different things all within (a)(7). [6]

ISI contends that Counts II-IV should be dismissed because Plaintiff has no evidence of its call abandonment rate, which is required to succeed on claims under § 64.1200(a)(7). (ECF No. 74, PageID.1159).

Count II should be dismissed. Plaintiff argues that the "abandon more than three percent of all telemarketing calls" statement is a "safe harbor" provision, which means it should be construed as an affirmative defense. So construed, Plaintiff insists that the burden of proof on abandonment lies with ISI, not him. (ECF No. 75, PageID.1388-89). He cites no authority suggesting that the abandonment rate is an affirmative defense.

Plaintiff's argument is not well taken. True, the FCC considers the 3% abandonment rate a "safe harbor." *See In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14104 (2003). "This provision requires information about the abandonment rate." *Dahdah v. Rocket*

---

[6] There is additional ambiguity when reading (i)(A) and (i)(B) together. The subsections are connected by the coordinating conjunction "and," meaning telemarketers must provide both opt-out options described in the sections. This would require telemarketers to provide contact information that would permit the called person to use to make a do-not-call request *and* an automated, voice or key press-activated opt-out mechanism. It seems, then, that the TCPA requires callers to provide two forms of opt-out mechanisms for every abandoned call.

*Mortg., LLC*, 2023 WL 5941730, at *5 (E.D. Mich. Sept. 12, 2023).[7]  The undersigned is unaware of any court considering the abandonment rate to be an affirmative defense rather than illegal conduct that the plaintiff must prove to succeed.  If the abandonment rate were an affirmative defense, there would be nothing for a plaintiff to prove on a claim for violation of (a)(7).  Subsection (a)(7) describes the unlawful conduct—entities are prohibited from abandoning more than 3% of telemarketing calls.  Thus, to establish a violation of (a)(7), a plaintiff will have to prove that the entity abandoned more than 3% of its calls in a single calling campaign.  The subsection does not suggest that the burden of proof on abandonment lies with the entity.  Because Plaintiff has not pointed to any evidence of an abandonment rate, Count II should be dismissed.

Counts III and IV should not be dismissed.  As shown above, it does not seem that (i)(A)-(B) require an abandonment rate to trigger liability.  ISI contends that the FCC Order in *In re Rules and Regulations Implementing the TCPA* Plaintiff relies on refers to the Federal Trade Commission's ("FTC") Telemarketing Sales Rule, not the TCPA, so it is inapplicable here.  (ECF No. 78, PageID.1460).

---

[7] This opinion was vacated on grounds that did not disturb the conclusions concerning subsection (a)(7).

ISI misreads the FCC Order.  In that Order, the FCC explained that it was revising its TCPA rules "with the Federal Trade Commission" by establishing a national do-not-call registry with the FTC.  The Order essentially explains the rules it adopted along with the FTC regarding provisions identical to TCPA regulations, including the call abandonment prohibition in (a)(7).  *See In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. at 14027, 14105 (2003) ("Congress recognized that because the FCC is bound by the TCPA, it would not be possible for the FCC to adopt rules that are identical to those of the FTC in every instance.  In those instances where such inconsistencies exist, Congress stated that either the FTC or FCC must address them administratively or Congress must address them legislatively.").  The Order is directly relevant to the issues addressed in Counts II-IV.

Plaintiff is correct that the abandonment rate does not apply to Counts III and IV.  This is confirmed not only by a plain reading of the regulation (as explained above), but also in the FCC Order.  The FCC said that the "Commission has similarly determined that when a telemarketer abandons a call under the three (3) percent rate allowed, the telemarketer must deliver a prerecorded message" identifying the caller and providing an opt-out mechanism.  *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. at 14108. Since ISI's argument in favor of summary judgment is limited to the lack of

evidence on abandonment rate, an argument that is inapposite to Counts III and IV, those claims should not be dismissed.

### 4.    Count V – Do Not Call

Count V alleges that Call 1 was a telephone solicitation to a residential telephone number registered on the national do-not-call list.  (ECF No. 1, PageID.27-28).  Since Plaintiff did not establish an agency relationship between ISI and Senior Benefits when Senior Benefits initiated Call 1, this claim should be dismissed.

### 5.    Count VI – Internal Do Not Call

Plaintiff alleges that ISI violated the TCPA in Calls 3-31 because it failed to honor Plaintiff's do-not-call request.  (ECF No. 1, PageID.28).  Title 47 C.F.R. § 64.1200(d) prohibits an entity from initiating an artificial or prerecorded call "for telemarketing purposes" unless the entity has procedures for maintaining a list of persons who request not to receive such calls.  Subsection (d)(3) requires the entity to maintain a list of persons who make do-not-call requests and to honor that request within a reasonable time.

During his conversation with Cornelius Rhodes at ISI, Plaintiff did two things relevant for this claim—Plaintiff used fake information to "purchase" an insurance policy and he asked Rhodes to place him on ISI's do-not-call list.  Then Plaintiff received Calls 3-31 from a number associated with ISI.

ISI insists that these telephone calls were not made for "telemarketing purposes;" rather, they were telephone calls following up on Plaintiff's fictitious purchase of an insurance policy.  Since they were not telemarketing calls, ISI says there is no TCPA violation.

Calls 6, 13, 14, 15, 20, and 24 resulted in voicemail on Plaintiff's residential line.  In those calls, the caller used the name Plaintiff provided when he "bought" the insurance policy, "Tom," and said that the call was to follow-up on the policy he purchased.  (ECF No. 74-10, PageID.1263).  Plaintiff spoke with Alex from ISI on Call 30.  Alex mentioned the policy Plaintiff had with Defendant EMC on that telephone call and that the payment for the policy did not go through.  (ECF No. 74-3, PageID.1220-21).

Plaintiff did not answer the remaining telephone calls and there is no associated voicemail, so the purpose of those telephone calls is unclear.  According to ISI, the remaining telephone calls were from the same telephone number and in the same period as telephone calls associated with voicemail and Call 30.  (ECF No. 74, PageID.1165).  Given the timing and the originating number, ISI contends that the remaining telephone calls were made for the same purpose—to follow-up on the insurance policy.  (*Id.*).

Mr. Rua testified that all 29 telephone calls were from ISI's retention department.  Rua explained, "The reason the retention department would call out is

in the event of an issue with a policy that a client expressed interest in obtaining and provided information for payments.  So, the retention department's responsibility is to ensure that if there's an issue with an application and for the benefit of the client, to ensure that they are getting the policy requested."  (ECF No. 75, PageID.1418).

Plaintiff points to Mr. Rua's deposition testimony to support his argument that ISI admitted that these telephone calls were for telemarketing purposes. Plaintiff asked whether the purpose of a telephone call from the retention department would be to encourage a purchase of ISI services.  Rua said "it's one of the reasons."  (*Id.* at PageID.1419).  This answer, according to Plaintiff, establishes that the 29 calls were for "telemarketing purposes."

ISI has shown entitlement to judgment on the telephone calls with associated voicemail and Call 30 when Plaintiff spoke with "Alex."  The voicemail transcripts make plain that those six calls were to follow-up on the insurance policy Plaintiff "bought."  Those telephone calls were not for telemarketing purposes.  Likewise with Call 30 where "Alex" talked to Plaintiff about his payment not going through. That the ISI representative likely wanted to obtain accurate payment information to complete the sale does not convert the telephone call into one for "telemarketing purposes."  These were follow-up telephone calls Plaintiff invited by pretending to purchase a policy.

Plaintiff has the burden of proof on the remaining telephone calls as well, and here he has the burden of demonstrating that there is a question of material fact as to whether those telephone calls were made for telemarketing purposes. Rua's testimony does not create an issue of material fact. Rua agreed that "encourage[ing] the purchase or investment in the goods or services which ISI was trying to sell" is a reason the retention department might initiate a telephone call. (ECF No. 75, PageID.1419). Rua's answer does not raise a question about the purpose of the remaining telephone calls here. A reasonable jury could not conclude, on the evidence presented, that the remaining telephone calls were for telemarketing purposes given that they came from the same number (the retention department) as the voicemails and Alex's call and during the same time. Absent evidence or a question to the contrary, the undersigned suggests that ISI is entitled to judgment on Count VI in its entirety.

### 6.     Count VII – No Do-Not-Call Policy

Title 47 C.F.R. § 64.1200(d)(1) requires telemarketing entities making artificial or prerecorded calls to "have a written policy, available upon demand, for maintaining a do-not-call list." Plaintiff alleges that ISI does not have a policy. (ECF No. 1, PageID.28). He testified that two times (during his fictitious purchase and on Call 30) he requested a copy of ISI's internal do-not-call policy but did not

receive the company's policy until it was produced in discovery in this litigation.
(ECF No. 74-3, PageID.1191, 1221, 1224).

ISI did not maintain its argument that subsection (d) applies to telephone
calls made for telemarketing purposes, and since the telephone calls were not for
telemarketing purposes, there is not TCPA violation here.  Instead, it argues that it
had an internal policy during the time of the telephone calls but that the statute
does not actually require entities to provide a copy of that policy.  In other words,
it is ISI's position that it is enough for it to have a policy capable of being provided
to the public, it need not actually provide the policy or it cannot be liable for failing
to provide the policy.

ISI's argument is correct on the surface.  Liability attaches only for the
failure to maintain a policy that is available on demand.  The regulation does not
penalize a telemarketer for having a policy but refusing to produce the policy.  *See*
*Hamilton v. Voxeo Corp.*, 2009 WL 1868542, at *4 (S.D. Ohio June 25, 2009)
("Plaintiff cannot recover for United Health's refusal to send him its do-not-call
policy.  He can only recover for a call made at a time when United Health did not
have such a policy in place.").

The trouble for ISI, however, is that its failure to provide a copy of the
policy after either of Plaintiff's requests "gives rise to a reasonable inference that it
did not have a policy available upon demand.  And the deficiency violates §

64.1200(d)." *Dobronski v. Selectquote Ins. Servs.*, 2025 WL 904370, at *11 (E.D. Mich. Jan. 14, 2025), *opinion vacated on other grounds*; *see also Hamilton*, 2009 WL 1868542, at *4 ("the fact United Health refused in 2008 to provide him a copy would be some proof that, on the relevant dates . . . , it did not have a written policy available on demand.").

Plaintiff testified that he requested a copy of the policy between May and August 2022, but never got a copy.  ISI does not contest this.  That said, Rua declared that ISI maintained a do-not-call policy that was in place since before May 1, 2022, before the first call to Plaintiff.  (ECF No. 74-7, PageID.1247, ¶ 8).  ISI attached an internal do-not-call policy to its brief, but the policy is undated. (ECF No. 12, PageID.1269).

The Court is faced with competing stories.  ISI's version of events establishes that it had an internal do-not-call policy capable of being produced, Plaintiff's version of events gives rise to the reasonable inference that ISI did not have such a policy because it didn't give Plaintiff a copy.  To decide in ISI's favor would require crediting Rua's declaration over the reasonable inference that ISI did not have a policy to produce.  At this stage, when the Court cannot make credibility determinations, the undersigned suggests that summary judgment not be granted on Count VII.

      7.     Count VIII – Falsified Caller ID

In the last federal claim, Plaintiff alleges that Calls 1 and 32 violated 47

C.F.R. § 64.1601(e)(1) because ISI or its agents failed to provide caller

identification information, which the regulation requires.  (ECF No. 1, PageID.29).

As a preliminary matter, this claim should be dismissed as to Call 1 because

Plaintiff did not establish an agency relationship between ISI and the entity that

initiated the call, Senior Benefits.  Any TCPA violation on Call 1 cannot be

imputed to ISI.

ISI argues that there is no private right of action under § 64.1601(e)(1) since

this regulation was promulgated under 47 U.S.C. § 227(d) which does not provide

a private right of action.  (ECF No. 74, PageID.1166-67).  It says that no court in

this Circuit has yet concluded that there is a private right of action for this kind of

TCPA violation.  (*Id.*)

On February 28, 2025, just weeks before ISI moved for summary judgment,

a Court in this district ruled in Plaintiff's favor on this issue in what appears to be

the first such ruling.  The decision was later published.  *Dobronski v. Selectquote*

*Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025).  Plaintiff relies on this case in

response to Defendants' argument.  (ECF No. 75, PageID.1398-99).  ISI did not

address it in its reply.

Courts have held for some time that § 64.1601(e) lacks a private right of

action finding that the regulation was promulgated to enforce § 227(d) of the

TCPA.  Section 227(d) lacks a private right of action; only subsections (b) and (c) include private rights of action.  Relying on *Worsham v. Travel Options, Inc.*, 2016 WL 4592373 (D. Md. Sept. 2, 2016), courts in this District reached that conclusion because of the similarity between requiring caller ID information and "technical and procedural standards" provisions in § 227(d).  *See Selectquote*, 773 F. Supp. 3d at 379 (collecting cases).

But *Selectquote* persuasively shows why the majority might be mistaken. The Court began by noting that the caller ID regulation is not a good fit for § 227(d)—the regulation requires caller ID for all telemarketing calls, whereas § 227(d) applies only to fax machines, ATDS, and artificial or prerecorded voice systems.  So it's not clear that § 227(d) gave the FCC authority to promulgate § 64.1601(e).  Next, the Court made the case for why, "as a matter of textual interpretation," the regulation was promulgated to enforce § 227(c) and thus includes a private right of action.  *Id.* at 378-80.  Section 227(c) focuses on protecting privacy rights through "methods and *procedures*" and "telephone network *technologies*."  *Id.* at 378.  The Court saw no reason why "the FCC could not promulgate technology-focused rules (like a caller-ID requirement) under § 227(c)'s 'telephone network technologies' language merely because it could also protect subscriber privacy rights in other, non-technological ways."  *Id.*  Section 227(c) allows the FCC to make rules protecting privacy rights; privacy rights

33

would be protected in part by § 64.1601(e) because telemarketers cannot hide behind anonymity. *Id.*

The undersigned finds *Selectquote's* reasoning highly persuasive and concludes in line with that case that the more logical conclusion is that § 64.1601(e) was promulgated to enforce § 227(c), so Plaintiff has a private right of action to bring a claim for violation of the regulation.

As this was the only argument raised against Count VIII, and the undersigned suggests following *Selectquote* and finding a private right action on the claim, summary judgment should not be awarded to ISI on Call 32.

### 8. Count IX – Violation of Michigan Law

In the final count, Plaintiff alleges that ISI or its agent violated two provisions in Michigan's Telephone Companies as Common Carriers Act ("MTCCCA"), Mich. Comp. Laws §§ 484.125(2)(a) and (2)(b), in Calls 1 through 31. Subsection (2)(a) prohibits delivery of a recorded message for commercial advertising unless the called person requested or consented to the call or provided their phone number to the caller. Subsection (2)(b) prohibits a company from calling to deliver or attempt to deliver intrastate commercial advertising if the caller does not display caller identification information.

#### i. Subsection (2)(a)

The parties agree that this claim applies only to Calls 6, 13, 14, 15, 18, 20, and 24, the calls for which ISI left a recorded message.  (ECF No. 75, PageID.1399).  Recall that an ISI employee left voicemail for Plaintiff to follow-up on the insurance policy he attempted to purchase with fake information.

As for those calls, ISI argues that Plaintiff consented to receive them, that the calls were not made for advertising purposes.  (ECF No. 74, PageID.1168).  Plaintiff insists that he did not consent to receive those calls because he did not knowingly and voluntarily provide his telephone number to ISI.  He says that during his call with Mr. Rhodes, where he made the fictitious purchase, he did not tell Rhodes his telephone number.  Instead, Plaintiff assumes that Rhodes obtained his telephone number through caller identification technology.  (ECF No. 75, PageID.1399).  And during that call, Plaintiff told Rhodes to place him on ISI's do-not-call list, so he says that he terminated any established business relationship.  (*Id.* at PageID.1400).

As discussed in relation to Count VI above, the recorded messages reveal that the telephone calls were not for commercial advertising purposes.  (*See* ECF No. 74-10, PageID.1263).  And Plaintiff cited nothing to support his claim that making a do-not-call request terminated the business relationship with ISI when he did not also rescind his fictitious purchase of the insurance policy.  For these reasons, the claim for violation of subsection (2)(a) should be dismissed.

Plaintiff's claim under § 484.125(2)(b) requires an intrastate call.  Pursuant to Mich. Comp. Laws § 484.125(1)(c), "intrastate" is defined as "originating and delivering within this state."  Though a question about the origin of the calls was raised in Plaintiff's deposition, the parties do not dispute that Calls 1-31 originated in Michigan to Plaintiff's Michigan telephone number, thus bringing the telephone calls within this statute.  (ECF No. 74, PageID.1169; ECF No. 75, PageID.1400-01).

ISI contends, however, that Plaintiff's claim under this subsection should be dismissed because Calls 2-31 came with caller identification information and Call 1 came from area code 734—a Michigan area code.  (ECF No. 74, PageID.1169).  Plaintiff contests the sufficiency of the caller identification information.  He points to 47 C.F.R. § 64.1601(e), which requires telemarketing callers to transmit identification that would permit the called person to make a do-not-call request.  (ECF No. 75, PageID.1402).  For Calls 2-31, Plaintiff called the caller-identified telephone number, but the call rang and went unanswered.  Thus, he could not return the telephone call and make a do-not-call request.  So he says that the information displayed did not meet the requirements of subsection (2)(b).

Michigan's statute does not go as far as the federal regulations do, and neither party raised the question of preemption.  On a plain reading of the statute, Michigan does not require that the caller identification information enable the

called person to return the call and make a do-not-call request.  So the fact that he

could not make a do-not-call request when he returned the call does not appear to

subject ISI to liability under the Michigan statute.  This claim should be dismissed.

### 9.    Damages

ISI asks the Court to order that Plaintiff is prohibited from recovering more

than once per call for each potential violation of the TCPA's automated call

requirement (§ 227(b)) and once for each violation of its do-not-call requirements

(§ 227(c)).  It also asserts that Plaintiff cannot recover under both the TCPA and

the MTCCCA.  The undersigned will not address this last argument given the

recommendation to dismiss the MTCCCA claims in whole.

ISI's position is amply supported by *Charvat v. GVN Mich., Inc.*, 561 F.3d

623, 631-33 (6th Cir. 2009) and *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir.

2011).  Plaintiff presented no contrary authority.  (*See* ECF No. 75, PageID.1402-

03).  If Plaintiff succeeds on any of the TCPA claims, he should be permitted to

recover only once per call for each violation of §§ 227(b) and (c), thus at most

recovering twice per call.

### 10.    Conclusion

In sum, the undersigned recommends that the Court make the following
determinations:

- ISI is not vicariously liable for any violation associate with Call 1, but
  there is a question of material fact on its vicarious liability for Call 32,

- Count I should be dismissed as to calls 1-31, but there is a question of material as to Call 32,

- Counts II should be dismissed,

- Counts III-IV should not be dismissed,

- Count V should be dismissed,

- Count VI should be dismissed,

- Count VII should not be dismissed,

- Count VIII should be dismissed as to Call 1 but not dismissed as to Call 32,

- Count IX (MTCCCA claim) should be dismissed, and

- Plaintiff should be limited to recovering damages once per call for each violation of the TCPA §§ 227(b) and (c).

## III.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN PART, DENIED IN PART**.

The parties here may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections lack merit, it may rule without awaiting the response.

Date:  August 1, 2025.

s/Curtis Ivy, Jr.
Curtis Ivy, Jr.
United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System or by First Class U.S. mail on August 1, 2025.

s/Sara Krause
Case Manager
(810) 341-7850